## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

**CIVIL ACTION NO. 10-234-WOB-CJS**

**PAPA BALLA SEYE**                                                                **PLAINTIFF**

**v.**                          <u>**REPORT AND RECOMMENDATION**</u>

**COMMUNITY YELLOW CAB,**
**NK MANAGEMENT L.L.C.,**
**and TOM NICOLAUS**                                                    **DEFENDANTS**

* * * * * * * * * * * * * * *

This diversity case involves a dispute over ownership and leasing of certain taxicabs.[1] Plaintiff has sued based on a number of common law causes of action, including fraud, tortious interference with a business relationship, conversion, intentional infliction of emotional distress (IIED), breach of contract, and unjust enrichment. Defendants have counterclaimed based on alleged breach of contract, unjust enrichment, harassment, and abuse of process.

Now pending before the Court is Defendants' Motion for Summary Judgment. (R. 29). This Motion has been referred to the undersigned for preparation of a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). Having received Plaintiff's Response (R. 30) and Defendants' Reply (R.

---

[1] The caption used here reflects the parties as named in Plaintiff's Complaint. (*See* R. 2). However, the Defendants' Answer and Motion for Summary Judgment, as well as the Plaintiff's Response, list the Defendants as "the Community Cab Company, Inc." ("CCC"), "NK Management, LLC," and "Tom Nicolaus II." (*See* R. 4, at 1; R. 29, at 1; R. 30, at 1). There has been no motion or agreed order substituting or correcting the case caption to reflect proper party Defendants. Regardless, because the parties are using CCC, NK Management, LLC, and Tom Nicolaus II in their filings, the Court will use these references as well in this Report and Recommendation.

32), the Motion is ripe for review.  For the reasons that follow, it is recommended that Defendants'

dispositive Motion be **granted in part** and **denied in part**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background[2]

According to the transcripts from Plaintiff's deposition, he began working as a taxi driver

for Defendants in 2008, after Tom Nicolaus, the sole president or manager of the corporate

Defendants, recruited him.  (*See* R. 2, at ¶ 12; R. 4, at 2 ¶¶ 4, 9-10; R. 33-1, at 19-21).  Plaintiff

worked as a manager of Defendants' airport drivers[3] from mid-January 2010 until June 2010.  (*See*

R. 2, at 3; R. 33-1, at 16, 24).  According to Plaintiff, Nicolaus hired him to bridge the cultural and

linguistic differences[4] between management and the disgruntled airport drivers.  (*See* R. 33-1, at 20-

21, 28-33, 67-69).

*Defendants' Business Model*

At all relevant times, Tom Nicolaus owned CCC and NK Management, both of which

operated a taxicab service out of the same business address in Newport, Kentucky.  (*See* R. 4, at 11

¶¶ 4, 9, 10).  The corporate Defendants had specific roles in the business model.  NK Management,

---

[2] Very little formal discovery has been taken and/or filed of record in conjunction with the summary judgment motion.  Plaintiff's deposition has, however, been filed.  (R. 33).  And because facts are viewed and inferences are drawn in the light most favorable to Plaintiff as the nonmoving party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), a substantial portion of the factual background is based on Plaintiff's deposition testimony.

[3] That is, the drivers whose driving routes included pickups and drop offs at Cincinnati/Northern Kentucky International Airport.

[4] Plaintiff indicated that a large percentage of the airport drivers were African immigrants, many of whom did not speak English.  (R. 33-1, at 28-33).  Plaintiff immigrated to the United States from Senegal in 1995, and he is able to speak several of the languages used by the drivers—Wolof, French, and Arabic—as well as English.  (*See id.* at 7, 83).

2

by and through Nicolaus, its sole member, admits that it owned vehicles used by the drivers, and also admits that it "sold vehicles to some of its drivers for an agreed[-]upon amount and payment plan." (R. 30-6, at ¶ 2). The property interest NK Management "sold" to the drivers is a matter of dispute in this case. NK Management also collected or paid sales taxes to the states of Kentucky or Ohio on "sold" vehicles, but did not "typically" transfer title to the "individual vehicles sold to individual drivers." (*Id.* at ¶ 6, 8). Instead, it held those titles even if the driver paid off the vehicle. (*See id.* at ¶ 7). NK Management retained titles "for the purpose of maintaining an insurable interest on the vehicles so that coverage under the fleet insurance policy could be maintained." (*Id.* at ¶ 6). CCC leased the vehicles to the drivers. (R. 30-6, at ¶ 6). It paid the insurance and fees required to operate the vehicles "in compliance with the Kentucky Revised Statutes as well as Rules and Regulations of the Department of Vehicle Regulation." (R. 4, at 11 ¶ 2).

Defendants did not employ the cab drivers, who instead had the status of independent contractors. (*See, e.g.*, R. 2-15; 2-17). Drivers paid a weekly fee to CCC for an operating authority lease, the use of taxis, insurance, and dispatch services. (R. 33-2, at 24). Drivers also reimbursed Defendants for such items as maintenance performed on the cab, and tag and insurance fees. (*See* R. 2-15-17; R. 30-3-5). The drivers who owned or leased cabs could not operate them unless granted the authority to do so under a CCC lease. (*See* R. 4, at 11 ¶ 1).

*The Taxi Buybacks*

Plaintiff alleges that in March or April 2010, Nicolaus told him that the Airport Board had issued a new regulation[5] which required all taxicabs operating out of the airport to be less than eight model years old. (*See* R. 33-1, at 80). Nicolaus asked Plaintiff to convey this information to the

---

[5] Nicolaus later informed Plaintiff that the airport regulation was not new, but that the Airport was now choosing to enforce an existing regulation. (*See* R. 33-1, at 90-91).

drivers, and Plaintiff did so.  (*Id.* at 82).  Since many of the drivers' cars were older than eight years,[6] there were drivers who offered to sell their vehicles back to Defendants in order to obtain money to "upgrade to the new rules of the newer model cars."  (*See id.* at 85-86).  Nicolaus was willing to buy back the cars, although for far less than the "$3,000.00 to $5,000.00" which the drivers had recently paid for them.  (*See* R. 2, at ¶ 20).  Defendants would either pay the drivers $500 per car, or would lease the cars for $100 a week per car.  (*See id.* at ¶ 20; R. 33-1, at 86, 93).  According to Plaintiff, the drivers felt betrayed by this action, because they felt that Nicolaus knew about the imminent airport regulation at the time that Defendants sold the aged taxis to the drivers.  (*See* R. 2, at ¶ 19-20; R. 33-1, at 88-89).  In other words, Nicolaus, knowing that the old taxis would soon be barred from the financially lucrative airport-driving routes, took advantage of the drivers by selling them the taxis at far higher prices than he knew he would be willing to pay them for repurchase once the new airport regulation was enforced.  Defendants deny that Nicolaus took advantage of the airport drivers.  (R. 4, at 3 ¶ 19-20).

*Plaintiff Purchases a Fleet of Taxis*

On April 3, 2010, Plaintiff decided to purchase thirteen cabs from the drivers (including cabs that were older than eight years) and lease them to Defendants under a $100 per car, per week oral contract.[7]  (*See* R. 2, at ¶ 24; R. 33-1, at 94-95; R. 33-2, at 1, 3-4, 6, 49).  Plaintiff has filed in the record signed "contract agreements" for the "purchase" of the vehicles specified by VIN and cab

---

[6] Plaintiff estimated that thirty to forty of Defendants' taxis were affected by the regulation.  (R. 33-1, at 91).

[7] Plaintiff would receive the $100 payment if the car was actually operated as part of the lease.  (R. 33-2, at 6-7, 49).

number.[8]  (*See* R. 2-2-12).  The purchase agreements do not list a purchase price, but Plaintiff's allegation that he paid $27,000 for this fleet of vehicles amounts to roughly $2,100 per vehicle.[9] (*See* R. 2, at ¶ 27; R. 2-2-12).  While the older taxis could not be used for airport runs, they could still be operated by drivers in Kentucky and Ohio.  (R. 2, at ¶ 24; R. 32-2, at 5-6).  Plaintiff says that the cars were still titled in Defendants' name at that time, but Plaintiff informed Nicolaus that he was buying the vehicles.  (*See* R. 33-2, at 2).  Plaintiff testified that Nicolaus "was able to go back to the [computer] system and change [the taxi records] and put [Plaintiff's] name on those car[s] because . . . those car[s were] kind of identified based on the owner of the cab."  (*Id.* at 4).

Despite these developments, the cars were titled and remained under Defendants' name (R. 33-2, at 2), and Plaintiff never acquired the titles.  Although Plaintiff asked that the titles be "transferred" to him, Nicolaus refused, initially citing "insurance" or "tax" purposes, and allegedly later performing unwanted and unnecessary maintenance on the vehicles as a justification for retaining the titles.  (*See* R. 2, at ¶¶ 28-41; R. 29-2, at 107-08, 146-47; R. 30, at 6).  In interrogatory answers, Defendants admitted they were aware that Plaintiff contemplated making his "purchase" from the airport drivers.  (R. 30-6, at ¶ 9).  But in their Counterclaim, Defendants challenge the characterization of this transaction as a "sale."  For example, they allege that if Plaintiff "purchased" these vehicles, he did so "without the consent of Defendants."  (R. 4, at 11 ¶ 1).

Plaintiff did not pay insurance on any of the vehicles.  (*See* R. 33-2, at 8-9).  He did, however, pay the licensing fees for both the Commonwealth of Kentucky and the City of Cincinnati

---

[8] Cab numbers 14, 17, 36, 70, 75, 81, 90, 143, 169, 217, 275, 501, and 502.  (*See* R. 2-2-12).

[9] This number includes "getting the cars ready for business."  (R. 2, at ¶ 27).

to operate his taxis within those jurisdictions.  (*Id.* at 9).  Plaintiff also paid to have the car paint schemes changed in order to operate the vehicles on non-airport routes.

Plaintiff claims that Defendants derived income from his cabs in the amount of $395.00 per cab per week in Kentucky and $355 per cab per week in Ohio (*see* R. 2-14; R. 33-2, at 71), and that Nicolaus orally agreed to pay him a $100 per cab per week lease payment ($1,300 per week total) (R. 2, at ¶ 24), consistent with what Nicolaus had previously offered to pay the drivers.  As proof of this oral agreement, Plaintiff points to entries on Defendants' driver charge reports that show $100 "CR" for individual cabs.  (*See* R. 30, at 11-12 & nn. 27-28).  It is not entirely clear what Defendants' accounting entries mean.  However, assuming that "CR" means "credit" and that the non-date numbers in the description column are taxicab numbers, the reports do reflect periodic "lease fees" around the $350 mark, which roughly coincide with the $395- and $355-per-week figures that Plaintiff claimed his cabs earned for Defendants.  (*See* R. 33-2, at 71).

The reports also contain "rearage car pay" entries that reflect periodic credits in $100 increments per week per cab.  So, for example, cabs 14, 217, and 169, which Plaintiff claims he owned, each received a $200 credit for two separate weeks ("4/14" and "4/21") on April 22, 2010.  (R. 30-4, at 2).  Cabs 75 and 502 each received a $100 credit for "4/21."  (*Id.*).  Likewise, on April 28, 2010, cabs 14, 70, 169, and 217 collectively received a $400 credit.  (*Id.*).  According to the Complaint, this arrangement lasted from mid-April 2010 through October 2010.  (*See* R. 2-14).

*A Dispute Develops Between Plaintiff and Defendants*

A rift developed between Plaintiff and Defendants around June 2010.  Plaintiff testified that Nicolaus had promised him that Plaintiff would be able to drive a cab during his free time without paying a lease fee to Nicolaus.  (*See* R. 33-1, at 24-25).  But because Plaintiff was working upwards

6

of eighty hours per week as a manager, he had no time available to drive—thereby limiting his income. (*See id.* at 23-25). As a result, Plaintiff asked for and was given a raise. (*Id.* at 25).

According to Plaintiff, after he returned from a trip to Spain in June 2010, the situation deteriorated. Nicolaus criticized Plaintiff's management results and said that Plaintiff owed him money for maintenance repairs to Plaintiff's vehicles. (*See* R. 2, at ¶ 40; R. 33-1, at 25-26; R. 33-2, at 17-18). Plaintiff countered that he did not authorize the repairs, and Defendants charged him for services that were not actually performed. (*See* R. 33-2, at 16-18). Plaintiff also complained that Nicolaus owed him more than $5,000 from the taxi leases. (*Id.* at 34-37).

Plaintiff testified that he resigned on either June 11 or 12, 2010. (R. 33-1, at 26-27). Within the next few weeks, Plaintiff and Nicolaus met to discuss the dispute. (*See* R. 2, at ¶¶ 44-52; R. 4, at 5 ¶¶ 44-52). The parties differ on whether Nicolaus initiated the post-resignation meeting and offered to transfer the titles, thereby acknowledging Plaintiff's ownership of the vehicles. They also disagree on why the police were called to intervene at the meeting. (*See* R. 2, at ¶¶ 44-53; R. 4, at 5 ¶¶ 44-53). The police report, if it exists, is not of record. And Defendants have not confirmed Plaintiff's assertion that the police officer who arrived at the scene advised Plaintiff to file a lawsuit because Nicolaus refused to hand over the titles to Plaintiff. (*See* R. 2, at ¶ 53; R. 4, at 6 ¶ 53).

Later, in August 2011, Nicolaus allegedly offered to transfer the titles to Plaintiff, provided there would be no further discussion or offer of money owed to Plaintiff. (*See* R. 33-2, at 13, 73). Plaintiff explained that he declined this offer because he was looking to receive not just the titles, but also the compensation that he was entitled to. (*Id.* at 73).

### B.   Procedural Background

Plaintiff, *pro se*, filed this diversity suit on October 18, 2010 (R. 2), and later became represented by counsel on August 4, 2011 (R. 24). Plaintiff's claims are based on breach of

contract, unjust enrichment, IIED, tortious interference with a business relationship, fraud, and conversion. Kentucky law applies to all claims. Defendants counterclaimed on November 2, 2010, and demanded damages for breach of contract, unjust enrichment, harassment, and abuse of process. (*See* R. 4, at 10-13). While Plaintiff did not depose any witnesses, Plaintiff was deposed. (*See* R. 33). Defendants filed this Motion for Summary Judgment on June 20, 2012, as to Plaintiff's claims; Defendants do not ask for summary judgment on their counterclaims. (*See* R. 29). Plaintiff responded on July 11, 2012 (R. 30), and Defendants replied on July 24, 2012 (R. 32). The Court held a settlement conference on November 30, 2012, which was unsuccessful in resolving the dispute. (R. 41). Accordingly, the Motion for Summary Judgment is now ripe for consideration.

## II.   LEGAL STANDARD

Under the federal rules, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Wilson v. Karnes*, No. 2:06-cv-392, 2009 WL 467566, at *2 (S.D. Ohio Feb. 24, 2009) (citing *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978)). In reviewing motions for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587-88; *Dominguez v. Correctional Medical Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). The nonmoving party, however, must provide more than a "mere scintilla of evidence"; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Dominguez*, 555 F.3d at 549. Also, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

8

### III.    ANALYSIS

Defendants' Motion for Summary Judgment challenges all six grounds for relief in the Complaint.   Defendants also argue that Nicolaus cannot be held individually liable.   These arguments will be addressed in the order presented in the Motion.  Upon consideration, the Motion should be **granted** as to the fraud, tortious interference with a business relationship, and IIED claims, and **denied** as to the other claims–conversion, breach of contract, and unjust enrichment– and on the issue of piercing the corporate veil to hold Nicolaus individually liable.

> #### A.    Plaintiff's fraud claim should be dismissed because he has not demonstrated actionable fraud under Kentucky law.

In Kentucky, a claim of fraud requires proof of the following six elements by clear and convincing evidence:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999)).

Plaintiff's fraud claim is framed in his Complaint as "fraud related to sale of [a] moto[r]vehicle over $500 without titles." (R. 2, at 15).  The claim indicates that Defendants have denied Plaintiff the right to claim tax deductions for his cars.  (*See id.* at ¶ 81).  The claim also charges that Nicolaus has improperly claimed tax deductions on the corporate tax returns for vehicle repairs, when in actuality those repairs were paid for by the drivers.  (*See id.* at ¶ 83).

In their Motion, Defendants first note that Plaintiff cited no law that required Defendants to transfer title with the sale of a vehicle.  They further argue that Plaintiff's allegations are directed

at Defendants' dealings with taxicab drivers other than Plaintiff.  (R. 29-1, at 3).  They then argue that, since there is no indication that the other drivers have authorized Plaintiff to pursue this claim on their behalf, the claim should be dismissed because Plaintiff is not the real party in interest under Federal Civil Rule 17(a).  (*Id.*).  According to Defendants, Plaintiff has suffered no injury as a result of Defendants' alleged malfeasance; instead, any alleged harm was suffered by other drivers.  (*See id.* at 4).  They maintain that, even if Plaintiff is the real party in interest as to some of these transactions, he has not pointed out any actionable misrepresentations made by Defendants.  (*Id.* at 5).  Plaintiff has admitted to purchasing the vehicles from other drivers (*see* R. 2, at ¶ 47); thus, in Defendants' view, any misrepresentations came from the drivers rather than from the Defendants (R. 29-1, at 5).

In the Response, Plaintiff first discusses KRS § 186A.215, which prescribes the procedures for the transfer of vehicle ownership.  (*See* R. 30, at 2-3).  Plaintiff argues that, under the statute, after Defendants sold the vehicles to the other drivers and several weeks had passed, Defendants should have submitted an affidavit to the county clerk stating that they transferred their interest in the vehicles.  (*See also id.* at 2 (citing KRS § 186A.215(4))).

Plaintiff also discusses in his Response the six elements of a fraud claim under Kentucky law noted hereinabove, arguing that he has met his burden on these elements for purposes of surviving summary judgment.  But even viewed in the light most favorable to Plaintiff, this claim fails.  The fraudulent tax deduction argument regarding the other drivers that Plaintiff asserts in his Complaint is meritless because Plaintiff has not demonstrated that he suffered any harm from such alleged acts by Defendants.  As to Plaintiff's claim of fraudulent failure by Defendants to transfer to him the titles to the vehicles, Plaintiff's responsive arguments for at least three of the required six elements are inadequate to survive summary judgment.

10

Plaintiff maintains that Defendants represented that, to their knowledge, the vehicle titles did not belong to Plaintiff, and that this representation by Defendants was material because it prevented Plaintiff from taking ownership of the vehicles he had purchased from some of the other drivers. (*See* R. 30, at 3). As to the second element, Plaintiff submits Defendants knew this material representation by them was false and a jury could so conclude because Plaintiff had notified Defendants of his purchase of the vehicles and showed Nicolaus the purported contracts for the other drivers' sales of their taxis. However, this alleged falsity of representation Plaintiff relies upon is in actuality simply Defendants' position that the titles do not belong to Plaintiff. Such a statement of opinion does not constitute a "misrepresentation" giving rise to an action for fraud. *See Porter v. Cathey,* No. 2011-CA-000398-MR, 2012 WL 2471107, at *8 (Ky. Ct. App. June 29, 2012) (citing *McHargue v. Fayette Coal & Feed Co.,* 283 S.W.2d 170, 172 (Ky. 1955)). Also, "[f]or a representation to qualify as a fraudulent misrepresentation, the party making the representation–at the time of making it–must know the representation is false or make it recklessly without any knowledge of its truth." *PCR Contractors, Inc. v. Danial,* 354 S.W.3d 610, 615 (Ky. Ct. App. 2011) (citing *Presnell Const. Managers, Inc. v. EH Const., LLC,* 134 S.W.3d 575, 580 n.16 (Ky. 2004)). Even following discovery, the issue of ownership remains contested in the case record, and so the falsity of Defendants' position has not been established. The written contracts of purchase with the airport drivers that Plaintiff points to are not conclusive of full ownership, and the record does not establish or clarify what interest the drivers possessed to convey to Plaintiff.

Plaintiff has also been unable to point to his reliance upon the Defendants' alleged misrepresentation as to ownership. He argues that he has not taken his vehicles to an alternate taxi company as satisfying this reliance element. (*See* R. 30, at 4). However, Plaintiff did not voluntarily refrain from taking the taxicabs to another company because he relied upon Defendants'

11

misrepresentation; rather, he could not take them elsewhere because of the dispute over their ownership and his lack of titles to the vehicles. Plaintiff simply has not shown that he relied upon Defendants' alleged misrepresentations. To the contrary, Plaintiff contested Defendants' right to retain the titles, most notably during the contentious meeting at which the police were ultimately called. (*See* R. 2, at 9-11). After the police officer advised Plaintiff to bring suit due to Defendants holding the titles, Plaintiff immediately brought suit. (*See id.*). "Where the plaintiff does not believe the statements or where he has knowledge to the contrary recovery [for fraud] is denied." *Nevitt v. Cole*, Civ. No. 3:97CV–778–S, 2002 WL 1758902, at *2 (W.D. Ky. July 29, 2002) (emphasis omitted) (quoting *Wilson v. Henry*, 340 S.W.2d 449, 451 (Ky. 1960)). Accordingly, the fraud claim should be dismissed.

> **B.   The tortious interference with a business relationship claim fails because Plaintiff has not demonstrated that Defendants knew about a valid business relationship or expectancy, and Plaintiff has not demonstrated Defendants' malice or significantly wrongful conduct.**

The parties agree that to prevail on this claim, Plaintiff must prove the six elements outlined in *Monumental Life Insurance Co. v. Nationwide Retirement Solutions, Inc.*: (1) a valid business relationship or its expectancy existed; (2) Defendants knew about this relationship; (3) the interference was intentional; (4) the motive for the act was improper; (5) causation; and (6) special damages. 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003) (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995)). The tortfeasor must cause a *third party* not to perform a contract or enter into or continue a business relationship with another party. *See Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977) (adopting RESTATEMENT (FIRST) OF TORTS § 766 (1939)). The salient element is Defendants' motive—the showing of "'malice or some significantly wrongful conduct.'" *See Snow Pallet, Inc.*

12

*v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012) (quoting *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988) ("'[T]he context and the course of the decisions make it clear that what is meant is not malice in the sense of ill will but merely "intentional interference without justification."'" (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. s (1979))).

This claim, as alleged in the Complaint, has two components: that Defendants interfered with a business relationship by using the false maintenance bills to avoid paying Plaintiff $100 per car, per week, as outlined in the oral contract; and that Defendants prevented Plaintiff from using his taxis with other businesses by withholding the titles.[10]  (*See* R. 2, at ¶¶ 73-75).

Defendants argue that Plaintiff's deposition testimony defeats this claim.  (*See* R. 29-1, at 6).  Plaintiff testified that he had a business relationship with Bill McCoy at Towne Taxi, and that there was not a written contract between them.  (R. 33-2, at 54).  The following dialogue then occurred:

> [Question:]    Did Tom [Nicolaus] or anybody at Community Cab know that you had any type of agreement with Bill McCoy to take cabs and put them in his fleet?
>
> [Plaintiff:]    No.
>
> [Question:]    So Tom didn't know about the relationship between you and Bill McCoy?

---

[10] The claim states, in relevant part,

73.   Defendants have made the same offer to all car owners to be able to collect $100 per car and per week and have knowingly obstructed with the business relationship against Plaintiff.

74.   Despite that knowledge, Defendants improperly and intentionally interfered with these business relationships by making up false repairs and maintenance claims while Plaintiff was out of the country to justify lack of payment to Plaintiff.

75.   Defendant Tom Nicolaus' conduct was willful, intentional and deliberate, designed to prevent plaintiff from taking his 13 taxis out of Community Yellow Cab and therefore would make more money elsewhere.   (R. 2, at ¶¶ 73-76).

[Plaintiff:]      I don't think he needed to know. . . .

(*Id.* at 54-55; *see also* R. 30, at 5).  Thus, Plaintiff admitted that Defendants were not on notice that a business relationship existed between Plaintiff and the third party McCoy, as required by the third element of the *Monumental Life Insurance* framework.   Moreover, paragraphs 73-74 in the Complaint fail to allege that a third party was involved in any capacity, and therefore the third party requirement from *Carmichael-Lynch-Nolan* is not satisfied.  (*See* R. 29-1, at 7).  In addition, there has been no showing that Defendants acted maliciously, that is, there is no evidence of "improper conduct."  (*See id.*).

Plaintiff counters that while Defendants did not know of a specific business expectancy between Plaintiff and a third party, they were well aware that Plaintiff intended to take possession of the vehicles in order to work with another taxi company.  (R. 30, at 6).  According to Plaintiff,

It is sufficient, in the present case that Defendants were generally aware of an expectancy and acted to thwart any such possible expectancy.  It was not relevant that Defendants knew or did not know specifically which third party they were interfering with, as they knew their interference would be sufficient to damage Plaintiff and any third party he chose.  In withholding titles and physical possession of the cars Defendants were assured that regardless of where Plaintiff might conduct business that such business would be impossible.

Actual knowledge by Defendants that there was a business expectancy by Plaintiff and various third party taxi companies can also be inferred.  The vehicles in dispute were all cabs.  Plaintiff's request to obtain the titles and possession of the cabs implies a desire to use such vehicles as taxi cabs elsewhere.  It would be unreasonable for Defendants to believe that Plaintiff intended commercially viable cabs to be used for non-commercial, non-cab roles.

(*Id.*).  Plaintiff argues that improper motive may be established through inference, as Defendants withheld the titles even when Plaintiff presented them with the contracts of sale between Plaintiff and the other drivers.  Defendants' conduct demonstrated "a wrongful means of interfering with Plaintiff's business expectancy which was dependent upon those vehicles."  (*Id.* at 8).

14

Upon consideration, paragraphs 73-74 of the Complaint fail to demonstrate that Defendants interfered with a business relationship under *Carmichael-Lynch-Nolan*. These paragraphs detail a two-person business transaction between Defendants and Plaintiff, and a tortious interference claim requires a showing that Defendants interfered with the business relationship between Plaintiff and a third party. Plaintiff has not pointed to evidence of such.

Paragraph 75 of the Complaint, however, requires a deeper investigation. The question is whether Defendants knew at the time of the allegedly tortious conduct that Plaintiff had entered into a valid business relationship or expectancy. As noted by Defendants, Plaintiff stated at the deposition that neither Nicolaus nor anyone else at CCC knew that Plaintiff had engaged in a business relationship with McCoy. They add that there is also no evidence in the record that Defendants knew about or in any way communicated with any person or business entity that was in contact with Plaintiff about utilizing his vehicles.[11]   (*See* R. 29-1, at 6-7).

The Court notes that Plaintiff has not cited to any case law for the proposition that a *general awareness* by an alleged tortfeasor that a plaintiff wishes to take his business elsewhere satisfies the third-party requirement for intentional interference. In a typical tortious interference scenario, there is a preexisting business relationship between the Plaintiff and a third party, and that relationship is known to the tortfeasor at the time of the alleged tort. *See, e.g.*, *Carmichael-Lynch-Nolan*, 561 S.W.2d at 99 (rival advertising agency's interference with another agency's existing contractual relationship with a client). A preexisting relationship—contractual or otherwise—is not required for a *prima facie* showing, as the tort also allows for a prospective relationship. *See id.* at 102

---

[11] Plaintiff also claims that he had a business expectancy with the company Ron's Taxi. (*See* R. 30, at 5; R. 33-2, at 64). There is no indication, however, that Defendants knew about Plaintiff's dealings with Ron's Taxi during the pertinent timeframe for the tortious interference claim.

15

(adopting RESTATEMENT (FIRST) OF TORTS § 766 (1939).  But Plaintiff has not demonstrated that Kentucky caselaw supports the proposition that a general awareness by the alleged tortfeasor that a person is interested in taking his means of business elsewhere ("a desire")—without even the tortfeasor's knowledge that the person has contacted prospective business partners—is sufficient to establish a tortious interference claim.  Defendants at least needed to be on notice that Plaintiff had been in contact with someone or a business entity about initiating a business arrangement.  Plaintiff has not made this sort of allegation.

Turning to the improper motive element, Plaintiff cites no evidence to show that Nicolaus's motive in retaining the titles was "malicious" or "significantly wrongful."  Indeed, Plaintiff's testimony that he and Nicolaus disagreed about retention of the titles, and Plaintiff's obligations to pay for repairs from the outset, underscores their genuine disagreement over the nature of what property right had been conveyed to Plaintiff and what Plaintiff was entitled to retain.  "[M]ere supposition and speculation [about any of these elements] are insufficient for a case to survive the summary judgment stage." *Snow Pallet*, 367 S.W.3d at 6 (citing *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006)).  Plaintiff's showing thus also fails on this element.

**C.    The conversion claim should survive. Defendants' offer is inadmissible evidence because it is an offer of compromise.  Moreover, the record demonstrates that Plaintiff refused Defendants' offer to return title not because Plaintiff intended to relinquish title, but rather because the offer was insufficient.**

In *Kentucky Association of Counties All Lines Fund Trust v. McClendon*, the Supreme Court of Kentucky listed the elements of a conversion claim:

(1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the

16

plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

157 S.W.3d 626 n.12 (quoting 90 C.J.S.: TROVER AND CONVERSION § 4 (2004) (quotation marks omitted)).

In the Complaint, Plaintiff argues that Defendants "refus[ed] to relinquish control of Plaintiff's titles and cars . . . [and] defendants by their actions, converted these properties to [their] own use by allowing people who drive Plaintiff['s] taxis to pay the company." (R. 2, at 16). This language does not explicitly mention the removal of parts as a basis for recovery under the conversion claim, but Plaintiff mentioned the alleged removal of parts at his deposition as an added basis in support of his conversion claim. (*See* R. 33-2, at 44-45).

Defendants argue that the fifth element, demand for title, is dispositive of Plaintiff's conversion claim. Defendants argue that Nicolaus offered Plaintiff the titles in August 2011, yet Plaintiff declined them. (*See* R. 29-1, at 8-9; R. 32, at 7-9). Defendants therefore maintain that Plaintiff's claim must fail. This argument is unpersuasive.

The Federal Rules of Evidence apply in diversity proceedings. *See, e.g.*, *Lee v. Medical Protective Co.*, 858 F. Supp. 2d 803, 807 (E.D. Ky. 2012). Offers of compromise are not admissible to prove the invalidity of a claim. FED. R. EVID. 408(a). Defendants' offer was made nearly a year after this litigation commenced; therefore, it may be viewed as an offer of compromise and is inadmissible to support summary judgment on this claim.

Even if the evidence were admissible, Defendants take Plaintiff's testimony out of context. Plaintiff did not decline the offer by Nicolaus to transfer the titles to him because he was

relinquishing his demand for the titles.  He declined because the offer was insufficient.  This lawsuit

was over a year old when the offer was made, and Plaintiff testified at the deposition that he "was

not looking just for the titles, [he] was looking for the titles *and . . . the compensation* that [he] was

entitled to."  (R. 30-8, at 8) (emphasis added).  The next question and answer at the deposition

bolster this proposition:

> [Question:]     Was there any offer of money, that you could take the titles to the cars
> at that time and then continue to discuss money, or was it you had to take the titles
> and no money and that was the end of it or—
>
> [Answer:]     Yeah, that's what I—that was my impression.  That I would just take
> the title and we're done.

(*Id.* at 8-9).  Thus, Defendants' argument for summary judgment on this claim fails.[12]

> **D.**     **The intentional infliction of emotional distress claim should be dismissed
> because Plaintiff has not provided legal support for the proposition that
> Defendants' behavior was "outrageous."**

The tort of IIED has "stringent standards" and "is intended to redress behavior that is truly

outrageous, intolerable and which results in bringing one to his knees."  *Williams v. City of London*,

252 F. Supp. 2d 388, 399-400 (E.D. Ky. 2003) (quoting *Osborne v. Payne*, 31 S.W.3d 911, 913-14

(Ky. 2000)).

Plaintiff alleges that Defendants acted maliciously by "confiscating Plaintiff's cars and

refusing to make the agreed upon payments."  (R. 2, at ¶ 68).  Defendants' IIED "has caused

---

[12] Defendants' second argument addresses Plaintiff's second basis for the conversion claim: that
Defendants removed parts from his vehicles without authorization.  Defendants argue that Plaintiff's claim
should be dismissed because his evidence is based solely on inadmissible hearsay by Defendants' former and
current employees.  (*See* R. 29-1, at 9).  The Court need not address admissibility because there is a genuine
issue over ownership.  The conversion claim can proceed on this basis.  If the conversion claim proceeds to
trial and the only evidence Plaintiff submits to support the "stripped for parts" aspect of the conversion claim
is inadmissible hearsay, the Court can exclude the evidence on that basis at that time.

Plaintiff to be under extreme stress to pay his household bills and could not sleep for many nights just thinking about options and where to get the money to pay his bills." (*Id.* at ¶ 69). As a result of Defendants' IIED, Plaintiff has suffered "severe stress [over his ability] to pay his household bills." (R. 2, at ¶ 69; R. 33-2, at 51). Plaintiff admitted at the deposition that he had not sought treatment for emotional distress. (R. 33-2, at 53).

Defendants cite several cases with extreme facts for the proposition that the conduct at issue here is not "outrageous," and cite Plaintiff's testimony to show that the only damage he incurred was financial distress. (*See* R. 29-1, at 10-11). Plaintiff's only counter-argument is that whether or not conduct is outrageous in a given community should be a question for the jury to decide, but he fails to cite any controlling law to support the proposition that the conduct here was outrageous. (*See* R. 30, at 11).

Defendants' arguments and authorities are sound and Plaintiff wholly fails to sustain his burden. Nothing in the Complaint rises to the requisite level of outrageousness that a meritorious IIED claim requires. Kentucky case law demonstrates that an IIED claim may be dismissed prior to trial. *See Whittington v. Whittington*, 766 S.W.2d 73 (Ky. Ct. App. 1989) (dismissing an IIED claim prior to trial for failure to state a claim). That course is appropriate here.

**E.    The breach of contract claim should survive summary judgment because Plaintiff has provided evidence that there was an oral contract, there was a breach of that contract, and there were damages as a consequence of that breach.**

"To prove a breach of contract, the complainant must establish three things by clear and convincing evidence: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *See Metro Louisville/Jefferson Cnty. Government v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citing *Barnett v. Mercy Health Partners–Lourdes, Inc.*, 233

S.W.3d 723, 727 (Ky. Ct. App. 2007)); *see also Sanders v. Motorists Mut. Ins. Co.*, Civ. No. 3:08-37-DCR, 2010 WL 3634668, at *3 n. 6 (E.D. Ky. Sept. 14, 2010) (citing *Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) (noting that Kentucky's clear and convincing evidence standard applied to oral contracts)).  "Kentucky has long recognized that some contracts are validly made orally rather than in writing." *Beaver v. Oakley*, 279 S.W.3d 527, 534 n.26 (Ky. 2009).

To satisfy the first element of the breach of contract claim, Plaintiff points to his oral contract with Nicolaus. (*See* R. 30, at 11).  That agreement specified that Nicolaus would pay Plaintiff $100 per car, per week.  Plaintiff has produced documentation that arguably demonstrates that he purchased certain cabs, and Defendants' records show a $100 weekly credit to those vehicles.  In Plaintiff's view, the breach consisted of Defendants' failure to continue the payments for the vehicles he owned that remained in service after he resigned. (*See id.* at 12).  Damages are obvious and continuing to the extent the vehicles remained productive. (*See id.* at 12).[13]

Defendants' position on the existence of an oral agreement has shifted as briefing evolved. Initially, they denied the existence of an oral agreement in conclusory fashion in their Answer and Motion for Summary Judgment. (*See* R. 4, at 4 ¶ 25; R. 29-1, at 11).  Their Motion for Summary Judgment assumes for purposes of argument that the oral agreement did, in fact, exist. (*See* R. 29-1, at 11).  After Plaintiff came forward with the evidence that supported the oral agreement, Defendants did not address the existence of an agreement in the Reply.  Instead, they focus on the second element (breach of contract), stating that if Plaintiff was not paid the $100 fee after

---

[13] Plaintiff has blended his breach of contract and unjust enrichment damages claims.  It is unclear, though not determinative, whether one or both damages are sought under both theories.

October 28, 2010,[14] then "there is no evidence that Plaintiff's taxi cabs were in use and thus Plaintiff cannot establish that he was owed any money."  (R. 32, at 11).

The records show that for some period after Plaintiff resigned, at least some of his vehicles were physically located at and continued to operate from the CCC, Inc. facility and generated income for Defendants, although it is unclear for how long this occurred.  Again, Defendants' own business records establish this fact.  (*See* R. 30, at 12 (discussion of lease fees for cab 275 dated October 12, 2010); R. 30-4 (tag fees for cabs 17 and 275 dated February 16, 2011); R. 30-5 (gate fees for cab 36 dated September 14, 2011); *see also* R. 2, at ¶ 54; R. 4, at 4 ¶ 54 ("without sufficient information to admit or deny"); *id.* at ¶ 47 ("Defendants admit that there were certain vehicles operated by various individuals referenced in paragraph 47 [of the Complaint]")).  Accordingly, Defendants have not shown a lack of genuine issue of material fact as to the breach of contract claim, and therefore summary judgment is inappropriate.

**F.    The unjust enrichment claim should survive summary judgment because Plaintiff has produced sufficient evidence that Plaintiff "conferred" a benefit upon Defendants.**

The equitable doctrine of unjust enrichment "'is applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another.'"  *Rose v. Ackerson*, 374 S.W. 3d 339, 343 (Ky. Ct. App. 2012) (quoting *Haeberle v. St. Paul Fire and Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989)).   To prevail under the theory of unjust enrichment, a plaintiff must prove three elements: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."  *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citing *Guarantee Elec. Co. v.*

---

[14] Plaintiff alleges that Defendants stopped paying him after October 28, 2010.  (R. 30, at 12).

*Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1380-81 (W.D. Ky. 1987)).  It is true that, "the first element not only requires a benefit be conferred upon the defendant, but also that the plaintiff be the party conferring that benefit."  *Pixler v. Huff*, Civ. No. 3:11–CV–00207–JHM, 2011 WL 5597327, at *11 (W.D. Ky. Nov. 17, 2011).  As a district judge of this Court recently held, cases which hold a plaintiff need not confer the benefit *directly* upon a defendant are "not at odds" with Kentucky's first element.  *Dixie Fuel Co., LLC v. Straight Creek, LLC*, Civ. No. 08–326–GFVT, 2011 WL 845828, at *4 (E.D. Ky. Mar. 8, 2011).  The Court is unaware of any Kentucky decision that holds otherwise.  Nor is this notion inconsistent with other jurisdictions.[15]

In the Complaint, Plaintiff argues, "[t]he money paid to Defendants on these cabs comes at the expense of Plaintiff's ability to profitably use the cabs with other companies.  Additionally the money paid as lease fees are fees which should have been paid at least partially to Plaintiff as owner of the vehicle."  (R. 30, at 12-13; *see also* R. 2, at 13).

Defendants argue that this claim should fail because "Plaintiff's response makes clear that he has no personal knowledge of any such use or profits and instead relied entirely upon the hearsay of several identified witnesses."  (R. 29-1, at 12).  And Defendants note that a motion for summary judgment cannot be defeated by pure reliance on inadmissible hearsay.  (*Id.* at 12).

---

[15] *See, e.g.*, *Freeman Industries, LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) ("[W]e conclude that to recover for unjust enrichment, a plaintiff need not establish that the defendant received a direct benefit from the plaintiff.  Rather, a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust. Our conclusion is consistent with other jurisdictions that have also concluded that the benefit received by a defendant need not be direct to establish an unjust enrichment claim."); *see also* Daniel R. Karon, *Undoing the Otherwise Perfect Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. VA. L. REV. 395, 421 & n.80 (2005) (examining numerous states' unjust-enrichment laws for the proposition that, "no state's unjust-enrichment law requires this additional element [direct benefit]").

Plaintiff's supporting evidence does not, as Defendants assert in their opening brief, rely exclusively on hearsay testimony of witnesses. (*See* R. 29-1, at 12). As previously discussed, it is also based on Defendants' own business records. It is plausible that Defendants were unjustly enriched because Plaintiff leased his vehicles to Defendants and they did not reimburse him for part of the fees—although the vehicles continued to generate income for Defendants. Plaintiff "conferred" this indirect benefit by not succeeding in taking title and his vehicles when he resigned. As noted above, an indirect benefit may satisfy the requirements of a claim for unjust enrichment. Thus, Defendants' arguments do not demonstrate that they are entitled to summary judgment on this claim.

> **G.    Summary judgment is not warranted as to Nicolaus's individual liability because Defendants' legal argument is contradicted by Kentucky case law.**

It is an elementary principle of corporate law that one of the chief characteristics of a corporation is limited liability for its shareholders and officers, barring exceptional circumstances. *See Schultz v. General Elec. Healthcare Financial Servs., Inc.*, 360 S.W.3d 171, 174 (Ky. 2012) (citing *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983)). Liability may be imposed, however, by either "piercing the corporate veil" or by violation of a statute imposing liability. *See Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 & n.7 (Ky. 2012). Piercing the corporate veil is an equitable remedy to be decided by the trial court rather than by the jury. *See Schultz*, 360 S.W.3d at 175. The recent Supreme Court of Kentucky decision in *Inter-Tel* discussed the circumstances in which piercing the corporate veil is appropriate. *See* 360 S.W.3d at 160-65. *Inter-Tel* addressed piercing in the context of a corporate parent and subsidiary. On the same day that *Intel-Tel* was handed down, the high court also addressed holding a corporate president and sole shareholder liable in *Schultz*. *See* 360 S.W.3d at 171. In remanding, the high court referred the

lower court to *Inter-Tel*, so it may be inferred that the Supreme Court of Kentucky does not consider the applicability of *Inter-Tel* limited to parent-subsidiary situations. *See id.* at 179.

Here, Defendants argue in their Motion for Summary Judgment that Nicolaus cannot be held individually liable because any claims that survive summary judgment should only be addressed to the corporate Defendants. (*See* R. 29-1, at 12). Defendants argue that Plaintiff has cited neither a statute nor facts that would support holding Nicolaus—a corporate officer—liable. (*See id.* at 12-13). Nor does the Complaint specifically ask the Court to pierce the corporate veil. (R. 32, at 12).

In response, Plaintiff uses the *Inter-Tel* factors for the basis of his argument that piercing is appropriate. Nicolaus "dominates" the corporate Defendants, as he is the president and only shareholder and corporate officer. (R. 30, at 14). Nicolaus was also the only corporate officer who ever dealt with Plaintiff. (*Id.*). Plaintiff points to Kentucky Secretary of State business record filings to prove that the corporate Defendants were a "mere façade" for Nicolaus's actions, noting that NK Management's "bad standing" allowed Nicolaus to "use that entity to commit torts and subsequently dissolve . . . to avoid liability, while safeguarding personal assets." (*Id.*).[16] Based upon these factors, Plaintiff claims that there is enough evidence to support piercing the corporate veil. (R. 30, at 15).

Defendants take the position in the Reply that because *Inter-Tel* is limited to a parent-subsidiary situation (not, as is the case here, president-sole shareholder), and because Plaintiff failed

---

[16] In addition to this argument not being determinative of the issue, it is also no longer factually correct. Plaintiff's argument is based on the status of the corporation as of July 10, 2012. (*See* R. 30-2, at 2). By July 20, 2012, the corporation was in "good standing," after defense counsel filed an annual report and paid the $15.00 fee on that date. *See* KENTUCKY SECRETARY OF STATE, FAST TRACK ORGANIZATION SEARCH: NK MANAGEMENT, LLC (2012), *available at* https://app.sos.ky.gov/ftshow/%28S%28z3fscb5uc5qzy3quti1gpuiz%29%29/default.aspx?path=ftsearch&id=0411318&ct=06&cs=99999.

to plead, allege, or conduct discovery on piercing, he fails to sustain his summary judgment burden. Defendants do not address the substantive arguments Plaintiff offered in the Response. (*See* R. 32, at 12-13).

Upon consideration, summary judgment on this issue should be denied. Neither side addresses *Schultz*, the controlling case here. Defendants erroneously assert that *Inter-Tel* is inapplicable because it only dealt with the parent-subsidiary context. Contrary to Defendants' assertion, the *Inter-Tel* framework is applicable because, as noted above, the high court in *Schultz* instructed the lower court to refer to *Inter-Tel*'s analysis in the president-sole shareholder context.[17] It remains in dispute whether, under the *Inter-Tel* framework, piercing is appropriate. Therefore, as a matter of law and fact, summary judgment should be denied on the issue of individual liability.

## IV.   CONCLUSION AND RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (R. 29) be **granted in part,** as to the fraud, tortious interference with a business relationship, and IIED claims, and **denied** in all other respects.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within **fourteen (14) days** or further appeal is waived. FED. R. CIV. P. 72(b)(2); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991)). Poorly drafted objections, general

---

[17] The parties also do not mention the Kentucky veil-piercing statute: "A shareholder of a corporation [may] become [personally liable] for the acts or debts of the corporation [if he] become[s] personally liable by reason of his own acts or conduct." *Inter-Tel*, 360 S.W.3d at 165 n.7 (quoting KRS 271B.6–220(2)).

objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. *Howard*, 932 F.2d at 509. A party may respond to another's objections within **fourteen (14) days** of being served with those objections. FED. R. CIV. P. 72(b)(2).

Dated this 22nd day of February, 2013.



**Signed By:**

*Candace J. Smith*

**United States Magistrate Judge**

G:\DATA\10-234-WOB Seye MSJ R&R.wpd

26